21 F.3d 1121
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Kenneth Earl FENSTERMACHER, Plaintiff-Appellee,
v.
TELELECT, INC., a corporation, Defendant-Appellant, and
Dealers Truck Equipment Company, Inc., a corporation;
MCERT, Inc., formerly known as Independent Testing
Laboratories, Inc., Defendants.
Kenneth Earl FENSTERMACHER, Plaintiff-Appellant,
v.
TELELECT, INC., a corporation; MCERT, Inc., formerly known
as Independent Testing Laboratories, Inc.,
Defendants-Appellees.
 Nos. 92-3283, 92-3297.
 United States Court of Appeals, Tenth Circuit.
 March 28, 1994.
 
 Before HOLLOWAY, GARTH,* and McKAY, Circuit Judges.
 ORDER AND JUDGMENT**
 MCKAY, Circuit Judge.
 
 
 1
 In this product liability action, Defendant-Appellant Telelect, Inc., appeals from a verdict and judgment awarding compensatory and punitive damages totalling $7,313,232.68 to Plaintiff-Appellee Kenneth Earl Fenstermacher.[1] Mr. Fenstermacher, a lineman with Kansas Light and Power Company ("KPL"), suffered extensive burns while using a T-5000 series bucket truck manufactured by Telelect to work on electrical lines. As a consequence of these injuries, doctors were forced to amputate both of Mr. Fenstermacher's arms at the shoulders. Mr. Fenstermacher argued that when an exposed piece of metal on an otherwise insulated boom contacted an energized line, the metal controls in the bucket also became electrified, creating an electrical circuit between the energized line, his body, and a neutral (non-energized) wire that he was holding with his bare hand. Telelect argues that the district court committed four counts of reversible error.[2]
 
 
 2
 I. ADMISSION OF TESTIMONY REGARDING REENACTMENT OF THE ACCIDENT
 
 
 3
 The accident occurred while the KPL employees were in the process of replacing a broken power pole. The energized east power line, or phase, and the non-energized middle phase had been disconnected from the pole and pulled down and to the east. They were then both tied off separately to the same tree. Mr. Fenstermacher held the energized west phase aside with his gloved hands while the other employees replaced the pole. Mr. Fenstermacher re-connected the west phase then removed his gloves and maneuvered the bucket so that he could grab the neutral phase. He asked that the neutral be untied from the tree so that he could proceed to reattach it to the pole. At the moment the neutral was untied, the other employees heard a frying sound, looked up, and saw Mr. Fenstermacher on fire.
 
 
 4
 Initial KPL investigations of the accident concluded that in maneuvering the bucket to reach the neutral phase, Mr. Fenstermacher had placed the boom in such a way that an exposed piece of metal on the underside of the boom, the jib cylinder anchor bracket ("JCAB"), was resting on the energized east phase. As a result, the metal basket controls became energized; and when Mr. Fenstermacher put his hand on the controls, a circuit was formed between the east phase, the JCAB, the controls, Mr. Fenstermacher, and the neutral line. The KPL investigation placed the blame on Mr. Fenstermacher for violating various KPL work rules.
 
 
 5
 Approximately six months before trial, Mr. Fenstermacher's counsel conducted a reenactment of the accident with the assistance of the other KPL employees who were present at the time of the injury. At trial, the district court admitted into evidence several photographs taken at the time of the reenactment, as well as testimony by the other KPL employees as to what they observed during the reenactment. The KPL employees testified that they had placed the boom so that it was several inches above the east phase, and that when the neutral phase was untied from the tree, the east phase rose up several inches to come in contact with the JCAB. This testimony raised the possibility that Mr. Fenstermacher had not placed the boom in contact with the energized line, as originally concluded in the KPL investigative report.
 
 A. Unfair Surprise
 
 6
 Telelect's first premise is that the reenactment was conducted in secret after the close of discovery and was not disclosed to Telelect, in violation of a local rule of court, thus unfairly surprising Telelect and prejudicing its ability to conduct a defense. We review a district court's decision to admit evidence under the abuse of discretion standard. Durtsche v. American Colloid Co., 958 F.2d 1007, 1011 (10th Cir.1992). A ruling admitting evidence may constitute reversible error only if it affects a substantial right of a party and "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context." Fed.R.Evid. 103(a)(1). While objections made in the heat of trial need not be perfect, the objection must "substantially satisf[y] the requirement of putting the court on notice" as to the grounds for the objection. Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 174 (1988).
 
 
 7
 Telelect urges this court to find that the objection to the testimony was adequate to notify the court as to the unfair surprise aspect of the objection, and that this ground for appeal was therefore adequately preserved. Telelect points to the following colloquy during the testimony of Kenneth Ahlvers, one of the KPL employees present at the accident scene, through whom the reenactment evidence was initially proffered:
 
 
 8
 Q [by Mr. Fenstermacher's counsel]: All right. Did KPL crew members go back out to the site this last September sometime and reposition the lines, the equipment, in order to take these photographs?
 
 
 9
 A: Yes, we did.
 
 
 10
 Q: And was this taken--
 
 
 11
 MR. COUGHLIN [Telelect's counsel]: You Honor, can we have a conference, please?
 
 
 12
 (Counsel approached the bench and the following proceedings were had:)
 
 
 13
 MR. COUGHLIN: Your Honor, we are going to object to this photograph. What this is, this is a re-creation. This is an expert photograph. You are trying to recreate an accident using this witness as an expert. This witness was never listed as an expert. This photograph was never listed as an expert re-creation.
 
 
 14
 THE COURT: What did he testify, that it's exactly the way it was?
 
 
 15
 MR. COUGHLIN: He's entitled to say what he saw. This is not a re-creation, accurate re-creation. He can say what he saw. No doubt about that. But to use this photo like you are doing a re-creation with an expert, he can't do that.
 
 
 16
 MR. NALLY [Mr. Fenstermacher's counsel]: Your Honor, I'm not going--
 
 
 17
 THE COURT: They do that all the time.
 
 
 18
 MR. NALLY: I'm going to ask him if that is a fair and accurate representation of what he saw.
 
 
 19
 THE COURT: Overruled.
 
 
 20
 (R.Supp. Vol. IV at 241-42.) According to Telelect's appellate characterization, the testimony about the accident reenactment "flabbergasted" its counsel because it constituted an entirely new theory of causation.
 
 
 21
 Notwithstanding Telelect's urging, we hold that this objection was insufficient to preserve the issue of unfair surprise. Construing the objection as broadly as possible, it reveals nothing more than an objection to the presentation of alleged expert testimony by a lay witness. While it is certainly possible that Telelect's counsel were surprised, and while that surprise may well have been evident in the tone of voice in which counsel made the objection, the trial judge is not a seer and cannot be expected to divine the nature and basis for counsel's objection from cues such as tone of voice. Nor can an appellate court reviewing the record sense that an objection was on the basis of unfair surprise in the absence of a statement to that effect in the record.
 
 
 22
 In his dissent, Judge Garth concedes that the above-quoted objection--which is the objection Telelect primarily relies upon as supporting its contention that it adequately preserved the issue of surprise--does not embody an objection grounded on a theory of unfair surprise. However, Judge Garth concludes that in a different objection, some eight hundred pages later in the transcript, Telelect explicitly asserted "lack of notice." This objection, according to the dissent, in combination with another objection shortly thereafter, and considered in the context of the record as a whole, constituted sufficient notice to the court as to the alleged unfair surprise. We are not persuaded.
 
 
 23
 First, we note that in Telelect's briefs on appeal, Telelect makes no explicit reference to the objection cited by the dissent in its argument on the issue of unfair surprise. The only reference Telelect makes to the objection quoted by the dissent is to merely characterize it in passing as an "amplification" of its earlier objection. (Appellant's Br. at 16; Appellant's Reply Br. at 2.) It is evident that Telelect relies primarily on the first objection rather than on the second objection during a different part of the trial in arguing that it sufficiently preserved for appeal the issue of unfair surprise. While there is no dispute that objections made in the heat of trial need not be perfect, the objection must be "timely" and must state "the specific ground of objection, if the specific ground was not apparent from the context." Fed.R.Evid. 103(a)(1). The objection must be "specific enough to allow the trial court to address the matter." United States v. Mitchell, 783 F.2d 971, 975 (10th Cir.), cert. denied, 479 U.S. 860 (1986). The specificity requirement contained in Rule 103 serves both to give the court and opposing counsel the opportunity to take corrective action and to avoid unnecessary error. See United States v. Hubbard, 603 F.2d 137, 142 (10th Cir.1979). Unlike an appellate court, a trial court does not have the luxury of examining the entire record in an effort to determine whether it can stitch together from various objections made at different points in the trial a particular ground for an objection to the admission of evidence: even if it could do so, such an approach would deprive opposing counsel of the opportunity to take corrective action and would only contribute to chaos in the trial process. The determinative factor, we believe, is whether the subsequent objection was sufficiently specific so that it could be reasonably expected that the trial judge would be put on notice not only of the ground for that objection, but of the ground for the prior objection as well. If a subsequent objection meets this standard, such objection may be sufficient in some circumstances to preserve the earlier objection for appeal. Such is not the case here.
 
 
 24
 We believe that a close review of the objection cited in the dissent reveals that, despite the use of the phrase "lack of notice," the objection has no relevance to the issue of alleged unfair surprise raised on appeal. On appeal, Telelect argues that Mr. Fenstermacher concealed the fact of the reenactment until trial, thus unfairly surprising Telelect with the evidence gleaned from that reenactment. This evidence, Telelect claims, constituted an entirely new theory of causation. By contrast, the objection to the testimony of Mr. Fenstermacher's expert witness relates neither to the fact of the reenactment nor to the theory of causation allegedly spawned by the reenactment. Rather, Telelect objected to Mr. Greene's testimony on the ground that it differed from what he had stated his testimony would be during his deposition. The "lack of notice" to which Telelect made reference in its objection to Mr. Greene's testimony was not to the fact of the reenactment, but to the fact that Mr. Greene was testifying as to a basis for his opinions that differed from the basis claimed in his deposition. This is especially clear from the second objection to Mr. Greene's testimony:
 
 
 25
 COUGHLIN: Your Honor, this witness is going so far beyond his deposition, it's just unbelievable. He made no references during his deposition to any investigation, anything about a lanyard ring, nothing about it. He told me in his deposition he was not even requested to do accident reconstruction on his investigation. This is totally unfair. This man is switching.
 
 
 26
 ....
 
 
 27
 This man cannot sandbag a person, hold back his opinions in deposition and then come into trial. I have an opportunity to take his deposition to find out his opinions in advance.
 
 
 28
 (R.Supp. Vol. VII at 1012-13.) The trial judge, in response to Mr. Coughlin's objection, told him to bring out his concerns on cross-examination. Id. A review of that cross-examination further reveals the nature of Mr. Coughlin's objection. That cross-examination consisted in large part of comparing Mr. Greene's trial testimony with that given during his deposition, and impeaching Mr. Greene's trial testimony with regard to where Mr. Fenstermacher's hand was located at the time of the accident with his testimony on that issue at his deposition. (See R.Supp. Vol. VII at 1041-46.) At no point during the cross-examination of Mr. Greene, or, for that matter, during the cross-examination of Mr. Ahlvers, the KPL employee through which the original testimony about the reenactment was proffered, did Telelect ever indicate that it was surprised by the existence of the reenactment, or indeed by the conclusions drawn therefrom.
 
 
 29
 Because we conclude that Telelect did not properly preserve the issue of unfair surprise with respect to the existence of the reenactment, we need not reach Telelect's claim with respect to the alleged violation of Local Rule 213 relating to discovery. Nevertheless, since the dissent is partially based on this issue, we deem it worth discussing briefly. First, after thoroughly reviewing the record, we have found no objection to the alleged violation; nor does Telelect indicate where it raised this objection in the trial court. Accordingly, we conclude that Telelect did not preserve this issue for review. The importance of this lack of an objection should not be doubted. Local Rule 213 gives the district court the discretion to admit evidence that has not been properly presented to the opposing party if, under the circumstances, the court deems such a decision just. D.Kans.R. 213(b)(11). Telelect's failure to object to the alleged violation of the local rule deprived the district court of its opportunity to rule on the matter and to either refuse to allow the evidence in on that ground or to exercise its discretion to admit the evidence in spite of the alleged violation. This deprivation goes to the core of the general rule that we will not consider an issue not passed upon below, which rule is "essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues ... [and] in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." Bradford v. United States ex rel. Dep't of Interior, 651 F.2d 700, 704 (10th Cir.1981) (alteration in original) (quoting Hormel v. Helvering, 312 U.S. 552, 556 (1941)). Telelect's failure to object to the alleged violation of Rule 213 not only deprived the trial court of the opportunity to rule on the matter, but also denied Mr. Fenstermacher the opportunity to present evidence on the factual question of when it provided the photographs to Telelect. As a result, Mr. Fenstermacher was forced to move to supplement the record on appeal to supply evidence that he had provided the photographs to Telelect prior to trial, and Telelect was forced to respond with a contingent motion to supplement the record to supply contrary evidence. In light of Telelect's failure to object and the fact that the district court may under the local rule admit evidence despite failure to disclose it in advance, a decision which we would review only for an abuse of discretion, we conclude that the disruption that would be engendered by allowing the alleged violation to form the basis for appeal at this point strongly cautions against reversing on this basis. Furthermore, we believe that Telelect's failure to object on the ground that Mr. Fenstermacher had violated Rule 213 is additional evidence that there was no unfair surprise in this case.
 
 
 30
 Finally, even were we to conclude that the issue was properly before us, we do not believe that the record (excluding the materials in the parties' respective motions to supplement the record, which motions we have denied) clearly indicates that the Local Rule was in fact violated. Contrary to the dissent's characterization, Mr. Fenstermacher does not admit that he withheld the reenactment evidence until "at best four days before trial, six months after the reenactment was completed." Infra at ----. Rather, Mr. Fenstermacher explicitly alleges that he provided the reenactment photographs in November 1991, at most two months after the reenactment and several months prior to trial. (Appellee's Br. at 13.) Mr. Fenstermacher then states that, at worst, the photographs were made available four days before trial at the exhibit marking session. Id. and n. 2. The conflicting factual assertions with regard to whether Mr. Fenstermacher provided the photographs to Telelect prior to trial make it clear that, even were we to have granted the parties' motions to supplement the record, this would be a factual dispute that must be resolved, if at all, by the district court rather than on appeal. A remand at this juncture, however, would wreak havoc and would quite possibly accomplish nothing in light of the district court's discretion to waive compliance with the disclosure rule. Given Telelect's failure to raise this issue in a timely fashion, we refuse to impose such a result.
 
 
 31
 In summary, we conclude that, properly construed, Telelect's objection preserved nothing more than the issue whether lay witnesses were improperly allowed to present expert testimony. We now turn to that question.
 
 B. Expert Testimony by Lay Witnesses
 
 32
 Telelect's second contention is that the testimony relating to the accident reenactment represented improper expert testimony by lay witnesses, because the persons who testified as to what happened during the accident reenactment admittedly did not see what happened at the moment of the accident itself and thus had no personal knowledge of the cause of the accident. This argument is without merit.
 
 
 33
 Federal Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed.R.Evid. 602. Federal Rule of Evidence 701 provides:
 
 
 34
 If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.
 
 
 35
 Fed.R.Evid. 701. Thus, if the witnesses had no personal knowledge of the subject matter of their testimony, or if they gave testimony in the form of opinions or inferences not rationally based on their perception, the admission of their testimony was error.
 
 
 36
 We conclude that the district court did not err in allowing their testimony. A review of the record reveals that the testimony of each of the KPL employees consisted of statements that the photographs taken at the accident re-creation accurately reflected what they observed at the accident itself.[3] They also testified as to what they observed during the reenactment. There was no improper opinion testimony, and there was no testimony that required expert qualifications.
 
 
 37
 The dissent argues that we are allowing first-hand knowledge of the reenactment to substitute for first-hand knowledge of the actual event. We emphasize that the witnesses in this case testified only as to what they actually observed at the time of the accident and what they actually observed during the reenactment. At no point did they proffer testimony not based on their personal observations. The case is therefore quite different from that in Swajian v. General Motors Corp., 916 F.2d 31, 35-36 (1st Cir.1990), cited by the dissent. Swajian involved the question whether, in an automobile accident, the wheel came off of the vehicle before or during the roll-over. The witness opined that the wheel separated from the vehicle prior to the roll-over, despite the fact that the witness did not observe the wheel separating. This was properly held to constitute impermissible expert testimony by a lay witness. In this case, by contrast, the witnesses testified only as to what they observed at the accident, and what they personally saw at the reenactment. The witnesses did not testify that Mr. Fenstermacher had in fact placed the boom several inches above the energized line: they could not properly have done so because they admitted they were not watching Mr. Fenstermacher at the moment of the accident. The witnesses only testified that, at the reenactment, they had placed the boom several inches above the line. Vigorous cross-examination was the proper way to ensure that the jury was aware of the full impact of the witnesses' lack of personal knowledge about what actually happened at the moment of the accident, and our review of the record indicates that Telelect conducted such a cross-examination. Furthermore, the dissent appears to credit Telelect's claim that the testimony regarding the reenactment went to the issue of Telelect's liability--a conclusion that we do not accept. The disputed testimony concerned whether the energized east phase rose up to contact the exposed metal bracket, or whether Mr. Fenstermacher had placed the boom so that the bracket was in contact with the energized phase. This question related not to Telelect's liability for defective design, which turned on the question whether Telelect was negligent in electrically bonding all of the metal basket controls to the exposed JCAB, but to Mr. Fenstermacher's contributory negligence in causing the accident. It thus related only to the question of the division of liability between Telelect and KPL and could not, by itself, serve to release Telelect from all liability.
 
 II. ADMISSION OF EVIDENCE OF OTHER ACCIDENTS
 
 38
 At trial, Mr. Fenstermacher offered evidence of four other accidents involving the T-5000 series bucket truck, and the trial court admitted the evidence. Telelect objected to the admission of evidence of two of the four accidents. Evidence of other accidents in product liability cases may be admitted to show notice or defect, provided that the party offering the evidence shows that "the circumstances surrounding the other accidents were substantially similar to the accident involved" in the current case. Wheeler v. John Deere Co., 862 F.2d 1404, 1407 (10th Cir.1988). "Whether accidents are substantially similar depends largely upon the theory of the case: 'Differences in the nature of the defect alleged may affect a determination whether the accidents are substantially similar.... How substantial the similarity must be is in part a function of the proponent's theory of proof.' " Id. (quoting Ponder v. Warren Tool Corp., 834 F.2d 1553, 1560 (10th Cir.1987)). The accidents need only be substantially similar, not exactly the same; and differences between the accidents not affecting their substantial similarity go to the weight of the evidence and not to its admissibility. Id. at 1408. We review the district court's determination of the substantial similarity of two accidents for an abuse of discretion. Id.
 
 
 39
 Telelect argues that one of the accidents, involving Mr. Moore, was not substantially similar to that involving Mr. Fenstermacher, and that the district court therefore erred in admitting evidence of that accident. This claim depends on the assumption that Mr. Fenstermacher's theory of the defect in this case was exclusively based on the exposure of the metal JCAB, in contrast to the Moore accident which occurred when the energized phase came in contact with the basket bracket rather than the JCAB.
 
 
 40
 We find this argument unpersuasive. It is clear from even a cursory review of the record that from the pretrial order through the closing statement, Mr. Fenstermacher's theory of liability was firmly predicated on the bonding of the various exposed metallic parts of the JCAB and other parts of the boom with the metal controls in the bucket. (See, e.g., Appellant's App. Vol. I at 69-75 (pretrial order); R.Supp. Vol. I at 7, 9, 19 and 25; R.Supp. Vol. III at 102 and 119 (Plaintiff's opening statement) and 171; R.Supp. Vol. IV at 281; R.Supp. Vol. V at 435; R.Supp. Vol. VI at 621; R.Supp. Vol. XIV at 2397, 2402, 2405, 2467 and 2469 (Plaintiff's closing argument)). We also note that the district court itself stated the theory of liability to be the so-called "bonding hazard." (R.Supp. Vol. IV at 394.) Even Telelect's counsel stated as much in Telelect's closing argument. (See R.Supp. Vol. XIV at 2425.) We therefore hold that the district court did not err in concluding that the Moore accident was substantially similar to the accident at issue in this case. Any differences between the two accidents went solely to the weight of the evidence, not to its admissibility.
 
 
 41
 Evidence of the second contested accident, involving Mr. Canfield, was submitted via the reading of the deposition of Telelect employee Raymond Spencer, which deposition was given in the course of discovery in another product liability case. Telelect argues that the admission of this evidence was error because the evidence consisted of double hearsay in that Mr. Spencer's deposition testimony consisted of repeating the statements of Ohio Edison employees who, in turn, were not eyewitnesses, but were merely repeating what they had been told about the accident.[4] At least on appeal, Telelect does not contest the substantial similarity of the Canfield accident.
 
 
 42
 When evidence consists of hearsay within hearsay, each level of the hearsay must fall within an exception to the hearsay rule for the evidence to be admissible.[5] Fed.R.Evid. 805. We review the trial court's decision to admit evidence for an abuse of discretion. Boren v. Sable, 887 F.2d 1032, 1033 (10th Cir.1989). When reviewing the trial court's rulings on hearsay objections, we afford heightened deference to the trial court's decision. Id. However, if either of the levels of hearsay fails to fall within a hearsay exception, then the trial court erred in admitting the evidence.
 
 
 43
 The district court permitted the reading of the deposition, stating, "I think it does bear a certain amount of trustworthiness and since obviously you [Telelect] are playing games about producing witnesses or not, if it is incorrect, why, you can certainly bring them." (R.Supp. Vol. VI at 629.) On its face, this ruling represents an application of Rule 804(b)(5)'s residual category of hearsay exceptions.
 
 
 44
 The district court did not, however, make an explicit finding that each of the two levels of hearsay fell within the residual category. Normally, we would expect the trial court to make an explicit finding as to each level of hearsay, rather than a global finding of indicia of reliability. However, we note that the objection to the evidence did not clearly indicate more than one level of hearsay: "Mr. Cherry [Mr. Fenstermacher's counsel] has specifically stated that Mr. Spencer was not a witness and is relying on hearsay statements of what other people said as far as how the accidents occurred." (R.Supp. Vol. VI at 622.) We do not expect instantaneous perfection in calculating the levels of hearsay for purposes of an objection. In the heat of the moment, an objection to hearsay might be sufficient to require a finding of an exception for each level. Nevertheless, we believe that in this case, given the fact that the accident report compiled by Mr. Spencer was prepared as part of Telelect's accident investigation and was of the type normally relied on, and was in fact relied on by Telelect, had Telelect's counsel clearly objected to both levels of the hearsay, the trial court would have found the residual category to cover both levels.[6] Such a ruling would not have been such an "overriding of the law by the exercise of manifestly unreasonable judgment or the result of [partiality], prejudice, bias or ill-will as shown by evidence or the record of proceedings," Boren, 887 F.2d at 1033 (quoting United States v. Wright, 826 F.2d 938, 943 (10th Cir.1987), as to constitute an abuse of discretion.
 
 
 45
 We therefore hold that the trial court did not err in admitting evidence of the Moore and Canfield accidents.
 
 
 46
 III. RESTRICTION OF TELELECT'S CROSS-EXAMINATION OF KPL EMPLOYEES
 
 
 47
 To demonstrate KPL's incentive to place all of the blame on Telelect, namely KPL's subrogated interest in the outcome to recoup the disability payments KPL had made to Mr. Fenstermacher, Telelect wished to cross-examine the KPL employee witnesses on the subject of an internal KPL memorandum which provided in pertinent part as follows:
 
 
 48
 The attorney (Mr. Jude Nally) representing Kenny in his third party lawsuit has requested to interview several of Kenny's co-workers. We are cooperating with Mr. Nally in his efforts to help Kenny and our company to receive restitution, if any is available, from the bucket truck manufacturer.
 
 
 49
 Appellant's App. Vol. I at 156 (emphasis added). At trial, Telelect offered this memorandum into evidence to impeach the testimony of KPL employees. Mr. Fenstermacher objected on Rule 403 grounds, arguing that the reference to KPL's financial interest constituted a reference to worker's compensation payments which Mr. Fenstermacher had received from KPL and that therefore the probativeness of the evidence was outweighed by its prejudicial nature. The trial court ruled that if Telelect would redact the text underlined above, the memorandum could be admitted, and Telelect acquiesced.
 
 
 50
 We review the trial court's Rule 403 weighing of the document's probativeness and likely prejudicial effect for an abuse of discretion. "The trial court has broad discretion to determine whether or not prejudice inherent in otherwise relevant evidence outweighs its probative value." United States v. Record, 873 F.2d 1363, 1375 (10th Cir.1989).
 
 
 51
 After reviewing the record, we conclude that the trial court did not abuse its discretion in directing that the memorandum be redacted and in limiting Telelect's cross-examination to bar inquiry into KPL's subrogation interest. Telelect had ample opportunity to impeach the KPL employees' testimony on the issue of their prior allegedly inconsistent statements about the cause of the accident through introduction of the KPL investigative reports. In addition, the jury was fully aware that KPL had a financial stake in the outcome regardless of the introduction of the document. Telelect repeatedly made reference to KPL's responsibility for the accident, and the jury instructions and verdict form required the jury to calculate and assign liability against KPL. On these facts, we cannot conclude that the trial court abused its discretion in ruling that the probativeness of one particular piece of evidence of KPL's interest was outweighed by the possible prejudicial effect of that evidence.
 
 IV. DETERMINATION OF PUNITIVE DAMAGES
 
 52
 Kansas law provides for a separate proceeding before the trial judge to determine the amount of punitive damages to be awarded. The statute limits the amount of punitive damages to the annual gross income of the defendant, based on the defendant's highest gross income for any one of the five years immediately before the act in question, or five million dollars, whichever is less. Kan.Stat.Ann. Sec. 60-3702(e). Telelect argues that the purchase of Telelect, Inc., a Minnesota corporation, by Simon-Telelect, Inc., a Delaware corporation, on February 5, 1988, negates the possibility of assessing punitive damages against Simon-Telelect for the actions of Telelect, Inc.
 
 
 53
 The district court held that, by defending the action brought against Telelect, Inc., and by failing to ever raise the issue of successor corporation liability until the punitive damages proceeding, Telelect waived this issue. (Appellant's App. Vol. I at 201-06.) We agree with the district court's analysis of this objection, and hold that the issue was not properly preserved. We note in passing, however, that Telelect's premise is highly questionable, because it would allow companies to avoid liability for punitive damages through simple corporate transactions, a result clearly not contemplated by the Kansas legislature.
 
 
 54
 Telelect next argues that the award of $3,750,000 in punitive damages is excessive and should be reduced. We will reduce the award only if we conclude that the amount shocks the conscience of the court. See Malandris v. Merrill, Lynch, Pierce, Fenner & Smith, 703 F.2d 1152, 1177 (10th Cir.1981), cert. denied, 464 U.S. 824 (1983). The trial court made substantial findings of fact to support its calculation of punitive damages under Kans.Stat.Ann. Sec. 60-3702(b). Those findings of fact are subject to review under the clearly erroneous standard. O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 901 (10th Cir.1992).
 
 
 55
 After reviewing the record in this case, the briefs of the parties, and the Order of the district court, we hold that the district court's findings of fact were not clearly erroneous and that the punitive damages awarded to Mr. Fenstermacher do not "shock" the conscience of the court.
 
 
 56
 The district court's evidentiary rulings and calculation of punitive damages are AFFIRMED.
 
 GARTH, Senior Circuit Judge, dissenting:
 
 57
 While I agree with all but two of the conclusions reached by the majority, I believe that Telelect's objections to Fenstermacher's use of the reenactment photographs were sufficient to preserve the issue of unfair surprise for appeal, and that, therefore, the majority rightfully should have reached the merits of Telelect's legal arguments. Having now considered those arguments, I am of the opinion that Fenstermacher's failure to notify Telelect of his intention to present the reenactment evidence, as well as Fenstermacher's introduction of the reenactment evidence via the testimony of lay witnesses who lacked first-hand knowledge of the accident itself, but who testified as to the cause of the accident based upon the reenactment evidence, infected the trial with sufficient error such that reversal and remand for a new trial are warranted. Because the majority holds otherwise, I dissent.
 
 
 58
 * The majority concludes that Telelect's objections to the introduction of the reenactment evidence were insufficient to preserve the issue of unfair surprise. As a result, the majority declines even to consider the question of whether or not the arguably most crucial evidence supporting the jury's $7.3 million verdict wrongfully was withheld from the defendant until immediately before trial.
 
 
 59
 As the majority points out, "[w]hile objections made in the heat of trial need not be perfect, the objection must 'substantially satisf[y] the requirement of putting the court on notice' as to the grounds for the objection." Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 174 (1988). Here, while the question of preservation may be a close one, my reading of the record satisfies me that Telelect preserved the issue of surprise as to the reenactment of the evidence, and the testimony that bore upon it.
 
 
 60
 I concede that the portion of the record quoted by the majority does not contain an explicit objection grounded on a theory of unfair surprise. Telelect's opening brief, however, at page 16, draws our attention not only to the objection deemed insufficient by the majority, but also to a second series of later objections made by Telelect during the testimony of Fenstermacher's expert witness, Mr. Greene. In reviewing the rulings of a trial court, we, of course, must look to the record as a whole. When Mr. Greene took the stand, and sought to testify as to the reenactment evidence, Telelect's attorney, Mr. Coughlin, explicitly objected. Coughlin asserted "lack of notice:"
 
 
 61
 COUGHLIN (Telelect's counsel): Your Honor, here is my problem. When I took this man's deposition, as to are you prepared to tell me today the opinions that you are going to give at trial of this case, he said, yes, sir. My next question, can it be agreed, Mr. Greene and Mr. Cherry, that if your opinions change in any way or if you do any more work in this matter, that you will notify Mr. Cherry and me promptly? Yes. Now, we were never notified about this. I have never been able to examine this man, anything about this re-creation. He said I would be notified if he did any more work. I was never notified.
 
 
 62
 NALLY (Fenstermacher's counsel): Judge, if I might speak to that real quickly. I'll make foundation, I guess it would be reverse foundation. Mr. Greene had nothing to do with the reenactment. It was done by KPL workmen that have testified to it, and he's not qualifying these pictures. I am just asking if these would be helpful. Let me finish please. I am just offering them to short cut his explanation of if what happened is reflected in the photographs and if he can use it as demonstrative, that is all it is.
 
 
 63
 * * *
 
 
 64
 * * *
 
 
 65
 COURT: Make your objection if you want to.
 
 
 66
 COUGHLIN: The objection is it's unfair, Your Honor, lack of notice.
 
 
 67
 COURT: Overruled.
 
 
 68
 (R.Supp. Vol. VII at 1007-1009.) After the district court judge permitted Greene to continue testifying, Mr. Coughlin again felt impelled to object:
 
 
 69
 COUGHLIN: Your Honor, this witness is going so far beyond his deposition, it's just unbelievable. He made no references during his deposition to any investigation, anything about a lanyard ring, nothing about it. He told me in his deposition he was not even requested to do accident reconstruction on his investigation. This is totally unfair. This man is switching.
 
 
 70
 COURT: You can bring it out on cross-examination.
 
 
 71
 COUGHLIN: Judge, that is not fair. This man cannot sandbag a person, hold back his opinions in deposition and then come into trial. I have an opportunity to take his deposition to find out his opinions in advance.
 
 
 72
 NALLY: Your Honor, the witness was asked and he discussed page after page about how he said the accident happened. And now we know the defendant's theory from their opening statement. I don't know how this witness could have addressed the defendant's theory long before their opening statement.
 
 
 73
 COUGHLIN: Do you know what the defendant's theory is?
 
 
 74
 NALLY: All I heard is what I heard Bill Turner say, there was a phase behind him or neutral behind him in the lanyard ring.
 
 
 75
 COUGHLIN: I asked him if he re-created this accident. I assume he did it by the time of his deposition. I asked him give me all your opinions. He said I'm not going to give any opinion about accident re-creation.
 
 
 76
 NALLY: All I am saying is to defend his own position I think he can distinguish how it's different from what he heard in opening statements, the defendant's position, and that is consistent.
 
 
 77
 COURT: Well, objection is overruled.
 
 
 78
 (R.Supp. Vol. VII at 1012-14.)
 
 
 79
 The majority concedes that a subsequent objection may be sufficient to preserve for appeal an earlier, presumably imperfect, objection. Here, one theme, i.e., unfair surprise, underlies all of Telelect's objections. I believe that these objections, taken as a whole, although not "perfect," were sufficient to "satisf[y] the requirement of putting the court on notice" as to defendant's concern that it had not been notified in a timely manner of the reenactment evidence.
 
 II
 
 80
 Rule 213 of the United States District Court for the District of Kansas requires in part that "[i]f additional witnesses or evidence are discovered after the pretrial conference, the discovering party shall immediately make this known to all parties and to the court in writing." The record reveals that Fenstermacher failed to give Telelect proper notice of his intention to introduce the reenactment evidence.
 
 
 81
 A brief chronology bears this out. The accident at issue here occurred on May 14, 1989. Fenstermacher filed his amended complaint on October 17, 1990. The district court judge held the final pretrial conference on August 2, 1991. The court mailed its pretrial order to counsel on August 28, 1991. On September 15, 1991, Fenstermacher organized a reenactment of the accident using the three KPL crewmen who were present at the accident scene. On November 14, 1991, Fenstermacher moved to supplement his witness and exhibit lists but still did not disclose the existence of the reenactment evidence. The trial commenced on March 16, 1992.
 
 
 82
 Fenstermacher claims that the reenactment photographs were "undeniably made available" to Telelect four days before trial at an exhibit-marking session. Appellee's Br. at 12-13. Telelect asserts that it first learned of the photographs the very moment they were introduced at trial. Appellant's Br. at 15.
 
 
 83
 We have held that evidence not listed in a pre-trial order will be admitted unless its admission would be prejudicial to the objecting party. MacCuish v. United States, 844 F.2d 733, 736-37 (10th Cir.1988); Smith v. Ford Motor Co., 626 F.2d 784, 797 (10th Cir.1980). Cf. Kaufmann v. United States, 1990 WL 58687 (April 25, 1990 D.Kan.) (denying motion to strike witness and exhibit list filed out of time under Rule 213(c) where no showing of prejudice or surprise); Joseph Mfg. Co, Inc. v. Olympic Fire Corp., 781 F.Supp. 718, 721 (D.Kan 1991) (holding pre-trial order should not be modified absent showing of manifest injustice to moving party).
 
 
 84
 Here, however, Fenstermacher has failed to explain why he withheld the reenactment evidence from the defendant, in violation of Rule 213, until, at best, four days before trial, six months after the reenactment was completed.
 
 
 85
 As mentioned previously, I conclude that Telelect's objections were sufficient to alert the district court to the disputed status of the reenactment evidence and, hence, to a violation of Rule 213, even if that rule was not explicitly mentioned. The district court rejected Telelect's objections out of hand. Had it fully considered Telelect's objections and, thus, the Rule 213 ramifications, there would have been no need for the parties before us to file motions to supplement the record on appeal.
 
 
 86
 The majority appears to credit Fenstermacher's assertion that the reenactment photographs were provided to Telelect in November 1991, two months after the reenactment took place, even though this assertion conflicts with the record before us that the reenactment evidence was withheld from Telelect until four days before trial, six months after the reenactment was completed. Even accepting Fenstermacher's contention that it delivered the reenactment photographs to Telelect in November 1991, that date is still more than three months after the final pre-trial conference was held on August 2, 1991. Notably, Fenstermacher never disclosed the reenactment evidence when he moved to supplement his witness and exhibit lists on November 14, 1991. Accordingly, whichever "disclosure" date the district court may have found had it entertained Telelect's objection, as it should have, Fenstermacher's actions were out of time and, in effect, blatantly circumvented the relevant discovery rules, the court's pre-trial order, and the court's own rule, Rule 213.[1]
 
 
 87
 If a question of fact remained as to when Fenstermacher provided Telelect with notice of its intention to use the reenactment evidence, a possibility the majority recognizes, we would be required to remand this case to the district court for such a factual determination and the exercise of discretion pursuant to Rule 213. Unlike the majority, I do not believe such a remand would "wreak havoc," nor am I dissuaded by the possibility that remand would "accomplish nothing in light of the district court's discretion to waive compliance with the disclosure rule." We are, after all, talking about a $7.3 million verdict, and a district court judge vested with discretion, but not unlimited discretion. A district court's waiver of compliance with the court's own rules of discovery, where such waiver causes a party unjust prejudice, I believe unquestionably constitutes an abuse of discretion.
 
 
 88
 Because this reenactment evidence was a--perhaps the--crucial component of Fenstermacher's case, I believe that Fenstermacher's failure to provide Telelect with advance notice of, and an opportunity to prepare for, the introduction of this evidence strongly prejudiced both Telelect's ability to present its case, and the proceedings as a whole.
 
 III
 
 89
 I also disagree with the majority's conclusion that the district court did not abuse its discretion in denying Telelect's objection to Fenstermacher's use of lay witnesses (i.e., the KPL crew members) to introduce "expert" testimony (i.e., conclusions based on the reenactment evidence).
 
 
 90
 Federal Rule of Evidence 602 demands that witnesses have personal knowledge of the matters about which they testify. Rule 703 exempts expert witnesses from this requirement. Rule 701 allows a lay witness to offer his opinion when it is "rationally based on the perception of the witness." See Swajian v. General Motors Corp., 916 F.2d 31, 35-36 (1st Cir.1990) (holding district court abused its discretion by permitting non-expert eyewitness, who lacked the perception required under Rule 701, to testify as to whether a wheel left a vehicle prior to a rollover accident where witness admitted he never saw the wheel leave the vehicle).
 
 
 91
 Here, each of the three KPL crew members admitted at trial that he did not actually see the accident occur. Thus, the majority's argument that the "photographs taken at the accident recreation accurately reflected what they [i.e., the KPL employees] observed at the accident itself" is internally inconsistent. The fact of the matter is that the KPL crewmen did not witness that critical moment when the energized phase came in contact with conductive matter. Nor were the crewmen qualified as experts to derive conclusions from the reenactment exercise.
 
 
 92
 If nothing else, this uncontradicted fact that the employees did not actually see what happened at the Fenstermacher accident belies the majority's belief that first-hand knowledge of the reenactment can substitute for first-hand knowledge of the actual event. Swajian, supra, is quite on point and, if followed, as I believe it should be, would require a reversal for a new trial.
 
 
 93
 Consequently, I would hold that the district court committed reversible error when it permitted these crew members to testify as to their first-hand knowledge of the reenactment as if such testimony was comparable to first-hand knowledge of the accident itself.[2]
 
 IV
 
 94
 The accident at issue here was, by all accounts, dreadful. There is, perhaps, no sum which can compensate Mr. Fenstermacher for wounds that will not heal and for a way of life he will never enjoy again. Nevertheless, Telelect should not be forced to pay $7,313,232.68 in damages without first having been given a fair opportunity to demonstrate that it was not responsible for Fenstermacher's injuries.
 
 
 95
 My review of the record discloses not only that the district court judge abused his discretion in admitting the reenactment evidence, and the subsequent non-expert testimony of the KPL employees, but that these issues were preserved by Telelect for our review. Fenstermacher concedes that he performed the reenactment after discovery had ended and there is no evidence in the record, beyond mere assertion, that the reenactment evidence was given to Telelect any time earlier than four days before trial. Moreover, a fair reading of the record reveals that the KPL employees who, admittedly, were not qualified to testify as experts under Rule 703, in fact testified to, and drew conclusions about, substantially more than what they witnessed at the actual accident scene.
 
 
 96
 By admitting this evidence, the trial court, in my opinion, tainted the trial proceedings to the extent that Telelect was unfairly denied the opportunity to prove that it was not the responsible liable party.
 
 
 97
 Contrary to the majority, I would therefore reverse the decision of the district court and remand this case for a new trial.
 
 
 
 *
 Leonard I. Garth, Senior United States Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 **
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [1]
 Mr. Fenstermacher cross-appealed from the district court's reduction of the jury award of actual non-economic damages to comply with Kansas law, arguing that the statute in question was unconstitutional. At oral argument, Mr. Fenstermacher conceded that this argument had not been raised in the district court and that it was therefore not properly before us. Accordingly, we do not address this issue
 
 
 [2]
 Mr. Fenstermacher's Motion for Leave to Supplement the Record and Telelect's Contingent Motion to Supplement the Record are hereby denied. We decide this case on the basis of the Record on Appeal
 
 
 [3]
 The dissent's comment that this statement is "internally inconsistent" misses the point. The witnesses observed the position of the bucket truck and the wires immediately prior to the accident; they also observed those positions immediately afterward. The only things not observed were their positions at the moment of the accident. There was no testimony by the witnesses on this latter issue
 
 
 [4]
 Telelect concedes that the reading of Mr. Spencer's deposition at trial did not constitute hearsay, as it was an admission against interest under Fed.R.Evid. 801(d)(2). (Appellant's Br. at 30.)
 
 
 [5]
 It is not clear from the record and briefs whether evidence of the other accidents was offered to prove defect or to prove notice of the defect. To the extent the evidence may have been offered to prove notice, it was not hearsay, as it was not offered to prove the truth of the matter asserted. Fed.R.Evid. 801(c). Because of the ambiguity as to the purpose of the evidence, however, we consider the availability of any hearsay exceptions
 
 
 [6]
 The business record exception of Rule 803(6) does not apply because the accident report compiled by Mr. Spencer was not made "by, or from information transmitted by, a person with knowledge." Fed.R.Evid. 803(6)
 
 
 [1]
 Rule 213 provides in relevant part as follows:
 (a) General Provision .... If additional witnesses or evidence are discovered after the pretrial conference, the discovering party shall immediately make this known to all parties and to the court in writing....
 (b) Procedure at Final Pretrial Conference.
 ....
 (11) Ordinarily, only witnesses listed pursuant to pretrial orders may be called to give testimony at trial. However, the court may, in its discretion, permit a party to call a witness not listed by that party or any party under such circumstances as the court deems just.
 (c) Effect of Pretrial Order. The pretrial order, when approved by the court and filed with the clerk, together with any memorandum entered by the court at the conclusion of the final pretrial conference, will control the subsequent course of the action unless modified by the consent of the parties and the court, or by an order of the court to prevent manifest injustice.
 (d) Sanctions....
 
 
 [2]
 The majority also seeks to excuse its holding by arguing that the disputed second-hand testimony of the KPL employees did not affect Telelect's liability, but only concerned the extent of Fenstermacher's contributory negligence. Inasmuch as the original accident report (Exh. 452), investigated and prepared by KPL, charged Fenstermacher alone with the negligence that caused the accident, I find it difficult to understand the majority's position that the reenactment evidence could not affect Telelect's liability